May it please the Court, I am Edna Walls, a Deputy Attorney General, here representing the California Department of Water Resources, in its capacity as the manager of the State Water Project. California traps, manages, stores, and delivers enormous amounts of water. And to do this, it needs to take electricity from its generators and move it to its pumps in order to pump the water. So in this capacity, it is the largest transmission user in the State of California. It conducts this transmission through pre-existing contracts with PG&E and Southern California Edison. In 1998, of course, the independent system operator came into being to regulate the transmission in California. And because of market dysfunctions in 2000 and 2001, the Federal Energy Regulatory Commission, or FERC, started looking into what it thought might have been some of the causes for the market dysfunction. Two suspects were that some of the market generators might be withholding energy in order to manipulate the price. And a related suspicion was that some of them might have been saying that their generators were out disingenuously, again, in order to cover the fact that they were withholding power from the market. So two proposals were, one, a must-offer provision, such that FERC was authorizing the ISO to tell generators that they must offer into the market. And the corollary was that the ISO should coordinate outages. And it came out in the final order that the ISO would have approval authority over the orders. The State Water Project and others said, must-offer doesn't work for us because we are a multipurpose function. We have to move water around. The timing is important. We have to move water for irrigation, for recreation, and for all of the purposes for which the State Water Project is managed, including getting water to the large metropolises in Southern California, as well, by the way, in the Bay Area. And FERC said, yes, we understand. Because of the multipurpose limitation in a water project, hydroelectric, we will not subject you to the must-offer provision. The State Water Project also protested that for the very same reasons that it couldn't be held to the must-offer, it couldn't have the ISO telling it when it should do maintenance on the State Water Project. It could not have the ISO withhold permission for it to take the actions that are required to maintain the State Water Project. So its outages equally could not be subject to control. Whereas the FERC recognized the must-offer and took that away as an obligation on hydroelectric, it said, well, we recognize that the State Water Project has said that the outage control should not apply to the hydroelectric. And it went on to say, ISO has the authority to control outage. So there was no reason to basis on the record for its refusal to also exempt hydropower from the outage control. Can you help me understand the practical difference between, as it affects your client, the must-offer provision and the outage control provision? How would the must-offer provision have affected your client had it been applied to your client? The must-offer provision says that when the ISO feels that it needs more generation, it tells a generator who is not fully scheduled that it must schedule power. What do you mean by not fully scheduled? Well, say it has a certain capacity, part of the capacity, or none of the capacity has been scheduled by the generator to be sold into the market. Meaning they're not generating the power when you say not scheduled? Exactly. They've got the generating capacity down for some reason. They've turned it off. And in the instances that I mentioned, there was some suspicion that some of the claims that they were down for maintenance or that there was a forced outage were perhaps not quite on the up-and-up. Right. And so FERC says to your client, we're not going to require that you comply or be covered with the must-offer because we understand you have certain needs having to do with moving water around, but we are going to exercise control over your outages. That's correct. Is there some practical difference in terms of a client? I mean, they seem to be almost two sides of the same coin to me. And what it means is that because they can't require us to offer, controlling when we are or are not having an outage  which is to make sure that they can call in power when they need it. But you think it can do you some harm? We believe that it can do us some harm in terms of our ability to plan the outages when we need to have them at the best time of the year, considering when water needs to be delivered, what the species requirements are at a particular time, and all the other concerns. So we think that it is not decision-making because of the internal conflict means that there is no utility whatsoever to achieve the purposes that FERC was seeking to achieve of having the ISO control when we have our outages. Let me just ask a follow-up question on suppose that they go to the other groups and say you must offer X amount, but they don't go to you, but they go to you and say you must have so much outage on January, March, and June, and so forth. How is that different from telling you you must offer? It's equally intrusive, but in the one case they're saying you must come into the market today and bring your product to market. And the other one is saying you can't have your facilities out of operation. That is disassembled is what essentially is happening. This is disassembled for maintenance so that if the ISO were to call you and say bring your power to market, you would have to say we can't do it. We've taken our facility apart and it's not up and running. We can't just flip a switch and tell you that the power will be coming your way. Well, if your facility is honestly disassembled, how in the world can they require you to provide? Well, they couldn't, obviously. Obviously they couldn't, and that was why they wanted to have control to approve outages so that if they did have occasion to call on you, they wouldn't be faced with an outage, and they wanted to stagger the outages of the different generators. To tell you when you could disassemble and when you couldn't disassemble. Exactly, exactly. So this order falls below the Federal Power Act and the APA standards of reasoned decision making and substantial evidence. For those reasons, and additionally for the reason that there was never any evidence that was suggested by anyone that hydropower providers were gaining the market by withholding power from the market. Well, you don't even say that so broadly. You mean California hydropower operators. I mean, that's you. What may be happening with a hydropower operator? Well, there are other hydropower operators besides us. I understand that, but you're only trying to say that you as the California DWR should not be constrained by this. You're not saying that Bonneville or somebody else. I mean, that's their business. That's correct. But there wasn't any suggestion that the hydropower facilities were in any way improperly withholding electricity. There's something in the record that tells us when the California Department of Water Resources has a pattern of having its facilities out for maintenance. Do they do it, for example, in the summertime or the wintertime? Or is there something that we know about this? I don't know of a pattern. I see. I think they, you know, obviously it's going to differ from year to year what needs to be done at a given facility. Maybe they need to do something every two years or every- I see. But there's just nothing in the record on that point. That's correct. There isn't anything in the record on that point. So the order falls below the standard of substantial evidence and reasoned decision-making for the reasons I have set forth. And it's further prohibited by the Federal Power Act, Section 102F, that says that that portion of the Federal Power Act under which the FERC was operating, which is to protect reasonability of rates for ratepayers, it says specifically that it doesn't apply to states. We need to reach that at this point. If you find that it fails for lack of substantial evidence, then you would never need to get to that. That's correct. But that's a jurisdictional argument that you're making. That is a jurisdictional argument. Isn't that a prior question? The reason I gave the other argument first, Your Honor, is because it's easy to understand and grab ahold of. You didn't press this very hard, did you, your jurisdictional argument? Before FERC? Yes. They claim that we didn't raise it sufficiently. What we did was say, and what's very obvious to FERC is that you don't have jurisdiction, and we cited and quoted from a FERC case to that effect. Yeah. Now, let me ask you this. The orders that existed against your controlling you before the order you now challenged to some degree controlled you, that is to say you already were required to notify, and under certain emergency circumstances you were required not to take outages. Isn't that right? That is true. In other words, under your jurisdictional argument, that order is invalid, too. I think that's correct, Your Honor. Had you ever made an objection to the existence of that order on a jurisdictional ground? We did not. So this jurisdictional argument sounds as though it's coming up kind of late in the game. I think that because you cannot waive the jurisdictional argument, the fact that we didn't make it at the time by the way we got into the PGA, I think it had already been there and probably the time to have challenged it was gone, but we were required to sign up under the participating, generating agreement. Some of these things get intertwined with issues of administrative law review. And it's seriously true that when FERC gives rules of general application, which is what we're dealing with here, by adjudication you have to sue on each order that comes out. And, of course, as FERC is always saying, well, it was yesterday's decision that you should have appealed or tomorrow's decision, but never today's decision. And, of course, we feel that here once they make the threshold decision that they will control our outages, we need to sue now in order to protect. It was a moving target, but you had just a one-sentence mention that FERC exceeded its jurisdiction. It didn't compare to the other portions of your petition. There was no supporting argument. There was no legal factual analysis, no supporting law. Did you just feel it was unnecessary? I think it's wrong to say that there's no supporting law. We did cite the FERC case that holds exactly this and mention the Federal Power Act and the jurisdictional issue. I was mistaken about that. So the issue was raised and was raised clearly. But it wasn't really ruled on. Pardon? Was it ruled on? It was ruled on not specifically the State Water Project. The FERC looked at when the objection was raised by other municipalities, notably the California Municipal Utility Association had made that, And the Court said, no, if you're going to transmit on this interstate transmission facility, we're going to rule you. Yeah. See, the problem I'm having is that I don't see any order here for our review that decides this point. The order did say that they were going to do it. Basically, that they're subject to outage control. And that's, as we point out in our brief, that's an impingement upon our sovereignty right there, which is an injury sufficient to create standing. And as this Court has said many times, the decisions that will drive later decisions are themselves a cause of injury. For example, in a number of cases, this Court has decided that a forest plan, which will drive later specific decisions, is itself an injury and can be sued upon. I would like to reserve some time. Thank you. I am Robert Solomon for the Federal Energy Regulatory Commission, the respondent in this case. And if I can, I'd like to cede five minutes of my time to counsel for Intervenor California Independent System Operator. You may do that, but you'll have to keep track of your own time. Before I turn to the jurisdictional questions at issue here, I'd like to step back and focus on the limited focus of the orders at issue here. Prior to these two orders, the California Department of Water Resources was already subject to coordination and some control by the California Independent System Operator. The focus of these orders is merely to expand and strengthen that oversight that the California ISO previously held over the California DWR. Can I ask you this? That previous control exercised by ISO over DWR prior to the April and the June orders in question here, was that prior control as a consequence of a FERC ruling, or was it simply because ISO independently decided to have to exercise that control? That was the result of tariff filings that the ISO made as a jurisdictional entity and filed with the commission and that the commission approved as part of the large tariff that governs the operation. And was that tariff filing done pursuant to an order by FERC, or was that initiated by ISO? I believe that was initiated by the ISO. And does that make a difference to us in determining whether or not there's a jurisdictional basis for the earlier control as compared to the later control? Yes, it does make a difference because it demonstrates the reasonableness of the commission's actions and also focuses on DWR's argument concerning whether the commission now is asserting some type of brand new regulatory paradigm. But it might also cut exactly the opposite way. This may be the first instance, at least on the record in front of us, in which ISO is regulating DWR because it has been told to do so by FERC. Previously it did it because it thought it could do so, and whether it could do so, that's a matter of state law. It's ISO compared to DWR. They're two state agencies. Right. I hear what you're saying. It's not my understanding that the commission previously directed the ISO to coordinate and control the operations of DWR. And indeed here, this is not a matter of the commission directing the ISO against its wishes to further oversee the operations of DWR's units. Rather, the record is clear that there is a substantial congruity here between the interests of the ISO and the interests of the commission. There were several rounds of comments here. And in those comments, the ISO made it rather clear that it was seeking strengthened or enhanced oversight authority over generators, including DWR's generators. Indeed, even before the commission staff issued its staff report, the ISO indicated that it was prepared to file revisions to the tariff that was already on file with the commission. And after the staff report issued indicating that the ISO should coordinate and approve any outage schedules of DWR, the ISO came back to us in several rounds of comments and said that we agree with you. We support the staff analysis. We agree that we should have additional oversight authority, which previously had been limited to the review of the reports submitted by DWR and other generators. And indeed, from an approval perspective, the DWR, I'm sorry, the ISO already had the authority to disapprove any outage schedules planned on less than seven days advance notice and already had the ability to disapprove any generator outage schedules, if necessary, to ensure the reliability of the grid in the event of any system emergencies. Why is it useful to FERC or UFERC and ISO to have the additional control that comes now as a consequence of the April 26th and June 19th orders? The overriding focus of the commission is to provide for additional sources of supply and to alleviate any potential there may be for the exercise of market power by the withholding of precious generating resources. And how does that rationale apply specifically to DWR, given DWR's needs to manage its water? The commission has not reached the conclusion that DWR has, in fact, exercised market power. I didn't say market power. I said manage its water. Right. The commission is certainly aware of the concerns raised at several junctures here in this proceeding by DWR. And, in fact, that's why the commission provided the exemption with respect to the must-offer requirement for hydroelectric units that provide for various usages and have various requirements independent of other generating units. But how does that help if they could control outages anyway? There are the two requirements. There's the must-offer requirement and there's the independent generator outage control. And I believe your honors asked what is the distinction between those two. They are devoted to the same overriding objective, which is to provide for additional supply. But the timing of the two requirements is, in fact, quite different. With respect to the must-offer obligation, we're talking about offering in the real-time energy imbalance as necessary to alleviate system emergencies on a minute-by-minute or hour-by-hour basis. When we're focusing on generator maintenance schedules, we're focusing on longer-term planning. We're focusing on annual planning. We're focusing on outages with more than seven days' advance notice, which was the extent of the authority the ISO already had over DWR. With respect to jurisdiction, I'd like to focus on- Before we get to jurisdiction, I'd like to stay on this point, if I could. I'm trying to understand the practical reasons why FERC, and I guess FERC and ISO, feel it necessary. They've exempted DWR from must-offer, but why do they feel it necessary to have the control over outages given the special needs of DWR? I can understand why they want it, but what I'm looking for is some statement that FERC has thought about reconciling the competing needs, on the one hand, of FERC and ISO wanting to predict and control outages, but on the other hand, DWR saying, you know, we've got our own independent needs we have to deal with. Where in the record is there some explanation as to how or why FERC has reconciled those two competing needs? It is, of course, a balancing and a reconciliation. Indeed, the section of the underlying order that focuses on this requirement, that's found at page 182 of the excerpts as provided by Petitioner. The very first paragraph indicates that the balance here is between providing sufficient energy resources versus providing for reliable plant operations. To be sure, to the extent the commission applies its various requirements, that could have an effect on plant operation. But the commission believes that it's not unreasonable to exempt DWR out of one of the requirements and not exempting DWR out of the other requirement, just as it would have been reasonable. Forgive me if I press you. I'm trying to find somewhere in the record an explanation as to why FERC believes it is reasonable to exercise the control over outages, not generally, but specifically as to DWR with DWR's particular needs in mind. The commission was responding to the comments of the various parties and was responding to the comments of the ISL. Where did it give the response that explained it, that that's what we're having trouble with? The response is found at page 182. That's the reference I gave you. Could you then read me the language on which you're relying? It's in the first sentence. I don't have it right in front of me. The sentence that says to ensure that sufficient generation capacity is available in the anticipated market needs, that sentence? Yes. Okay. But that's a general sentence. It says nothing about DWR or hydro generators. That is correct. The commission was responding to dozens of comments. And in the rehearing order, it was responding to approximately 40 requests for rehearings. And to be sure, in the initial order, the April order, in this section of the order, the commission did not respond directly to DWR. But it does, as to hydro, with respect to must-offer. It's very careful to say hydro people have different needs, and as to must-offer, we're responding to those needs. That is correct. The commission was not ignoring the concerns. Well, they weren't ignoring them as to must-offer. We're left to guess as to whether they had them in mind as to outage control. Well, certainly with respect to the must-offer requirement, the commission made it clear that it was responding directly to DWR and was responding to the specific concerns of hydroelectric generators. Yes. In the order on rehearing, the commission does respond directly to DWR and does note DWR's concern. Can you show me where they respond to DWR? I have that page in front of me, and I was unable to find that response. That's on pages 220 and 221. Correct. That's the June 19, 2001, order on rehearing. Yes. And can you point to me in that order where they respond to DWR's concerns? It responds to those concerns only to the extent that the commission makes clear that it will not make an exemption with respect to generation outage, with respect to any specific category of generator, whether it's hydroelectric units or smaller qualifying facilities and cogeneration units. Yes. So it says DWR contends. Yes. But it doesn't say why it disagrees with the contention. It merely gives its conclusion that we are not going to abide by what DWR wants. Yes, but I believe it's important to take those paragraphs in which the commission discusses the precise generator outage control issue and place that in the context of the many pages preceding the discussion of specific issues, which talks about the various reconciliations and balancings that the commission must undertake on all of these issues, which provides the fundamental framework, analytical framework, for the commission's analysis in this case. The focus is on promoting supply. The focus is on the summer of 2001 and making sure that sufficient supply is on hand to avoid the exercise of market power and to ensure that consumers are adequately protected. With respect to the specific logistical concerns of DWR, the commission was not unaware of those concerns. Judge Fletcher, in both of the orders on review, the commission identified, even in those paragraphs discussing this precise issue, that either a filing was forthcoming from the ISO or, in fact, has already been made by the ISO. So with respect to the specific concerns of DWR as to how it could reconcile this enhanced authority with its specific water deliverability concerns, the commission recognized that this was a matter for an upcoming filing or a filing that had already been made and which was later the subject of several orders, precisely responding to the logistical concerns, whether, in fact, the State would be able to administer its water responsibilities at the same time respecting and abiding by the ISO requirements. Those aren't in this record. That is mostly not in this record. The orders at issue here do reflect the fact, in the April order, that a filing was forthcoming. There were other documents that were going to be forthcoming. Yes, and that's the basis for the commission's aggrievement or standing argument, that the focus of DWR is not generally with respect of being under the ISO's authority. The DWR is already under the ISO's authority. The focus of DWR's concern is how to administer that oversight authority and still reflect DWR's very varied and multitudinous responsibilities. You have only about five minutes left if you want to. Okay. Then I will focus very briefly on the jurisdictional issue concerning regulatory oversight over the DWR. As your honors indicated, this was an issue that was presented with less than specific clarity before the commission. The commission is not ducking that issue. Indeed, in the must-offer sections of the orders on issue, and indeed in the later orders that are not presented to you at this time, the commission did discuss in excruciating detail the nature of its regulatory oversight over governmental entities or non-public utilities. The issue that DWR presents to you at this moment is of considerable concern to the many other petitioners who are currently petitioning for review in the larger California case, California Public Utilities Commission v. FERC, which is the 0171051 case. This case is really a preview of coming attractions, and the commission believes that this court would really have great difficulty assessing the merits of the issues presented by DWR and truly understanding the reasonableness of the commission's discussion without also having in front of it the later orders in this docket or the other orders in which the commission approved the precise generator outage requirements as later filed by the ISO with the commission. Thank you. Thank you. May it please the Court. My name is Michael Ward with Swidler Bullion, Sheriff Friedman, representing the California Independent System Operator Corporation. Your Honors, I would like to attempt to clarify what I think is some confusion in response to questions from Judges Nelson and Fletcher regarding the must-offer requirement. The must-offer requirement is not a requirement that generators make their generation available in emergencies. DWR is subject to that requirement. That is a requirement in Section 5.6.1 of the California ISO tariff that is applicable to all participating generators, including hydroelectric generators. The must-offer requirement requires that generators bid their electricity into the California markets. It is much more onerous to the degree that you can be sent automatically by if your bid is the next in merit order, you go. So that would mean that, in essence, DWR would have almost no control over when it does and doesn't produce. Under the emergency calls, they would only be called upon in emergency situations. And this, again, is why it is necessary that there be some control over outages, because if everyone is on outages at the same time, there is not enough control in emergencies. Again, Judge Fletcher, I don't think it is a question of DWR participating in gaming. It is a question of if there is insufficient generation available at any point, as the Commission, I think, has noticed throughout its orders, other parties can engage in gaming and exercise market power. The important thing is that generation available be coordinated so that there is, in most times, sufficient capacity available. Why isn't it sufficient for purposes of ISO coordination that it be notified by DWR? Let us say you know within the notification period, which is going to be a fairly long lead time, okay, that is a fixed thing, you know it. Why isn't that enough? Many outages, Your Honor, are not voluntary. They are forced outages. Yes. And by DWR going out whenever they want, if there are forced outages, there might be a situation where it is impossible for DWR, where there wouldn't be enough generation if DWR went out. And the ISO knowing about that wouldn't make any difference, because the forced outages have taken a lot of energy out of the situation. Maybe we are not yet on the same page. What is the time frame within which DWR is required to notify? That part of the order they are not challenging. They say yes, we are happy to notify. What is the time frame under which they notify? Every year operators set forth their schedules for outages. So they will notify you a year ahead of time of what their planned outage is. The reason for the ISO to reject an outage is if system reliability requires the rejection. Right. And you won't know that until an emergency shows up? But the emergency may occur more than seven days in advance. If a unit goes out with an outage that is going to be out for a month, the ISO may know that there is not going to be enough available. So what you are wanting is not to disapprove at the time of the original filing of the notification. You want to disapprove, say, we approved your outage last year. That is fine with us. But now we see we are going to have a problem three weeks down the road, and we don't want you to schedule. That is what you are after. That is what the tariff would allow the ISO to do, Your Honor. And they are saying, but wait a minute, that may be exactly at the time when we are trying to pump a lot of water. And they are saying that so interferes with our functioning as to our water management. Excuse me, I didn't mean to interrupt. The ISO tariff prohibits the ISO, very specifically in Section, which is mentioned in our brief, 2.2.1. It says nothing in the tariff shall be interpreted to allow the ISO to require the violation of any permit requirements for hydroelectric, fish requirements, water supply requirements. We are not allowed, or the ISO is not allowed, to issue requirements that would force those violations under the terms of the ISO. I saw that, but there may be a lot of things that DWR does that they are not required by law to do, but they think they should do because of good management. And those things you say you get to override. I believe the Commission has concluded, and I think it is the thrust of the argument, that the need to assure adequate electricity in California may interfere with DDO's preferred way of delivering water at times as necessary. Actually, I would like to ask one more question. I'm not saying that the ISO doesn't have the power to do that, or FERC doesn't have the power to authorize ISO to require it, but I'm asking for some evidence that FERC thought seriously about the very question you and I are discussing. And I don't find much of that. I understand that, Your Honor. I think the Commission's decision has to be looked at in the context of all the submittals. Thank you. Thank you. I think the question that Judge Fletcher has asked has really gone to the heart of the question whether the Federal Energy Management Agency should take unto itself the authority to tell California how to run its water project. And this is both the practical question and the jurisdictional question. And as has been mentioned, although FERC set out that the State Water Project had raised the question that hydropower should not be subject to outage control, FERC never directly responded to that. And the question cries out in large part because of the exemption from the must-offer. If they can't be required to offer, what good does it do to tell them when they can't be out if they can't be required to offer? So there's the inconsistency. There's the failure to respond. There's the jurisdictional issue. And this is a case not as part of the larger issue about who's selling power at what prices in the FERC-regulated market. This is the question as to what do you do when you're staying at home trying to run your water project? Can FERC reach out to you then and tell you when and how you can conduct the maintenance on that? So this is the very narrow issue and is not part of the larger question that is in part of the underlying docket. I think that's all I have. Thank you. Thank you. The case has already been submitted. Thank you.
judges: Schroeder, Dw Nelson, W. Fletcher